UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20mj 2133-Reid

UNITED STATES OF AMERICA

vs.

**TIPHANI PEREIRA and
RICHARD TRAVON WALKER,**

       **Defendants.**
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003? _____ Yes __x__ No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007? _____ Yes __x__ No

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

BY: _____
CARY O. ARONOVITZ
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No. 86425
99 N. E. 4th Street
Miami, Florida 33132-2111
TEL (305) 961-9131
FAX (305) 530-7976

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br>Tiphani Pereira and Richard Travon Walker,<br><br>Defendant(s) | )<br>)<br>) Case No.  20mj 2133- Reid<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __Dec 1, 2019 to Jan. 27, 2020__ in the county of __Miami__ in the __Southern__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Pereira and Walker<br>18 USC §§ 1591(a)(1) and 1594(c) | Recruit, Entice, Harbor, Transport, or Advertise a Victim to Engage in Commercial Sex Acts by Means of Force, Threats of Force, or Coercion, and Conspiracy to Recruit, Entice, Harbor, Transport, or Advertise a Victim to Engage in Commercial Sex Acts by Means of Force, Threats of Force, or Coercion. |
| Walker<br>18 USC § 1001 | False Statements to a Federal Officer |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

_____
Complainant's signature

SA Joseph Oliver, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __01/28/2020__

_____
*Judge's signature*

City and state: __Miami, Florida__    Lisette M. Reid, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Joseph R. Oliver, having been duly sworn, hereby depose and state:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), United States Department of Justice ("DOJ"), currently assigned to the Child Exploitation and Human Trafficking Task Force of the FBI's Miami Division. My duties involve the investigation of a variety of violations of federal criminal law involving human trafficking, the sexual exploitation of children, and the sexual enticement of minors. I have been an FBI SA since August 2016. Prior to my employment with the FBI, I worked as a Police Officer and Crimes Against Children Detective with the Lexington Police Department in Kentucky from 2012 to 2016 where I responded to and investigated cases involving violent crimes against children.

2. I am a law enforcement officer within the meaning of Title 18, United States Code ("U.S.C."), Section 2510(7), and I am empowered by law to conduct investigations, execute and serve search warrants, and make arrests for offenses enumerated in Title 18 of the Unites States Code, and for offenses against the United States.

3. This affidavit is made in support of probable cause for the arrest of TIPHANI PEREIRA ("PEREIRA") and RICHARD TRAVON WALKER ("WALKER") who did knowingly, in or affecting interstate commerce, recruit, entice, harbor, transport, advertise, maintain, and solicit by any means a person, that is, VICTIM 1, to engage in commercial sex acts by means of force, threats of force, or coercion in violation of Title 18, United States Code, Section 1591(a)(1) and (b)(1), and conspiracy to commit same, in violation of Title 18, United States Code, Section 1594(c). Further, as to WALKER, there is probable cause that he did make a false

statement to a federal law enforcement officer, in violation of Title 18, United States Code, Section 1001. Since this affidavit is being submitted for the limited purpose of demonstrating probable cause in support of the criminal complaint against PEREIRA and WALKER, I have not included each and every fact known by me concerning this investigation, and have included only those facts and circumstances that I believe are sufficient to establish probable cause for the issuance of the requested criminal complaint and arrest warrant. The information contained in this affidavit is based upon my personal knowledge and observations, my training and experience, and information obtained from other law enforcement officers and witnesses.

## PROBABLE CAUSE

4. On Monday, January 27, 2020, the FBI Miami's Child Exploitation and Human Trafficking Task Force and the Miami-Dade Police Department ("MDPD") conducted a joint "out-call" operation, utilizing an MDPD undercover officer (the "UC") at the Stadium Hotel located at 21485 NW 27th Avenue, Miami Gardens, Florida.[1]

5. At approximately 7:46 PM, the UC responded to an online commercial advertisement, which was posted on www.megapersonals.com, a website known to law enforcement and your Affiant to be utilized for the purposes of prostitution. At approximately 8:47 PM, the female ("VICTIM 1"), arrived at the hotel to engage in sexual activity with the UC. VICTIM 1 arrived in a gray Mercedes C250 with Florida license plate "IQEI05." The vehicle was driven by PEREIRA, and WALKER was seated in the back seat. The vehicle was registered to

---

[1] An "out-call" operation is defined as a situation whereby a person responds to a law enforcement controlled location for the purposes of engaging in sex for money with the undercover.

Individual 1, who is WALKER's mother. VICTIM 1, PEREIRA, and WALKER were all detained for further investigation.

6. VICTIM 1 was interviewed first. She agreed to speak with law enforcement and stated that she met PEREIRA approximately 5 years ago on Facebook via mutual Facebook friends. They eventually met face-to-face, and began a friendship, which developed into a business relationship.

7. In approximately 2014, VICTIM 1 began to prostitute for PEREIRA at the Crosslands Motel on Commercial Boulevard in Fort Lauderdale, Florida. PEREIRA's mother also worked out of the Crosslands Motel under the direction of a pimp known as "Nick." PEREIRA and VICTIM 1 each performed commercial sex acts and had to pay Nick $200 per work day.

8. Eventually, PEREIRA suggested to VICTIM 1 that they break away on their own. PEREIRA suggested she would set up VICTIM 1's advertisements and dates, and that VICTIM 1 would have to pay PEREIRA fifty percent (50%) of all her earnings.

9. Shortly after, PEREIRA became extremely persistent, demanding VICTIM 1 to consistently do multiple dates on a daily basis. After a couple of months of working under PEREIRA's control, VICTIM 1 expressed to PEREIRA that she no longer wanted to prostitute or otherwise engage in commercial sex acts. PEREIRA denied VICTIM 1's request. Upon her second request to get out, PEREIRA told VICTIM 1 she had to buy her way out for $250.

10. VICTIM 1 gave PEREIRA the $250, moved into an apartment of her own, and for a while did not work for PEREIRA.

11. In December of 2019, VICTIM 1 and PEREIRA were socializing together. PEREIRA received a phone call and stated to the unknown caller that "I'm not selling pussy right

now." Through this statement, VICTIM 1 realized that PEREIRA was still involved in prostitution. VICTIM 1 mentioned to PEREIRA she needed to make money and again began working for PEREIRA.

12. PEREIRA asked VICTIM 1 to send her pictures for her online advertisement. VICTIM 1 sent the pictures via text message. PEREIRA created the advertisement and posted it on EscortAlligator.com, which is a website known to law enforcement for the advertisement of commercial sex. PEREIRA stated she would get 50% of the earnings.

13. PEREIRA installed the "Talk-a-tone" application in both her cellular telephone, as well as VICTIM 1's cellular telephone. PEREIRA created the account with VICTIM 1's information, including her name and telephone number. The purpose of the app was to communicate with male customers, who responded to the posted commercial sex advertisements. PEREIRA instructed VICTIM 1 not to answer any Talk-a-tone phone calls or text messages because only PEREIRA was allowed to answer the Talk-a-tone messages.

14. The applications were installed on both devices and worked simultaneously to appear as if run by VICTIM 1, when in fact they were being operated by PEREIRA. Every time PEREIRA made any changes to or within the application, VICTIM 1 would receive a security code on her device, and PEREIRA would request the security code via text messages. It was through "Talk-a-tone" that PEREIRA arranged dates, set prices, and answered telephone calls and/or text messages from potential customers.

15. PEREIRA set all the prices for the commercial sex dates. VICTIM 1 was expected to see a minimum of one date per day. For the past 3 days, between on or about January 24 through on or about January 27, VICTIM 1 had approximately 10 to 15 dates per day. In those 3 days,

VICTIM 1 made approximately $1,000 and PEREIRA kept the remaining funds that had been gained through commercial sex acts.

16. Most dates were "in-calls," where potential dates came to PEREIRA'S house located at 1508 NW 8th Avenue in Fort Lauderdale, Florida, 33311. If there were "out-call" dates, then PEREIRA drove VICTIM 1 to the dates and waited for her to be done, at which time she collected the 50%. Most of the time the transactions were made in cash; however, sometimes VICTIM 1 sent the money to PEREIRA via CashApp. The CashApp accounts were registered in PEREIRA and VICTIM 1's names, respectively.

17. PEREIRA had a boyfriend, who VICTIM 1 knew as "D," and was later identified by law enforcement as WALKER. On or about January 24, 2020, PEREIRA texted VICTIM 1 informing her that "D" quit his job as a porter at a car dealership.

18. On the way to the first out-call on January 27, 2020, VICTIM 1 heard PEREIRA tell WALKER something to the effect of, "Now that he was not working, WALKER could drive VICTIM 1 to her dates, and she would give him $40 from her portion for every ride he gave her." "D" immediately agreed and requested the $40 right away.

19. VICTIM 1 stated most of her dates were "in-calls," which were done at PEREIRA'S house, and inside PEREIRA'S bedroom. VICTIM 1 preferred "in-calls" for safety reasons, but sometimes PEREIRA demanded VICTIM 1 to conduct "out-calls."

20. On the evening of January 27, 2020, PEREIRA instructed VICTIM 1 to get ready for an "out-call." VICTIM 1 normally did not do "out-calls" in Miami-Dade County, but PEREIRA insisted on VICTIM 1 doing any calls that came through because her light bill was due on January 28, 2020 and PEREIRA needed money to pay for it. The date would be for a half-hour

at a hotel and VICTIM 1 was instructed to charge $240. PEREIRA drove VICTIM 1 to the hotel, while WALKER rode in the rear passenger seat of the Mercedes Benz vehicle.

21. VICTIM 1 feared PEREIRA because she had verbally threatened to cause her physical harm in the past if she did not comply with PEREIRA's demands. Additionally, PEREIRA owned two Taser devices, one black and one pink, which she kept in her home, and threatened to use on VICTIM 1. PEREIRA had previously threatened VICTIM 1 with the Taser. As a form of intimidation, PEREIRA had physically caused harm to other unknown individuals in the presence of VICTIM 1. Additionally, WALKER carried a .40 or .45 caliber black handgun in his pocket while at the house. VICTIM 1 stated she was in fear for her life if she tried to stop completing commercial sex acts in which PEREIRA received payments.

22. During the "in-call" dates, the gun was kept under the mattress where VICTIM 1 conducted the commercial sex acts. VICTIM 1 was in fear and always nervous because she knew the gun was there and PEREIRA and/or WALKER could easily hurt her. VICTIM 1 had repeatedly expressed to PEREIRA that she wanted to quit performing commercial sex acts, but PEREIRA continued to tell her she needed money to pay for the bills.

23. VICTIM 1 provided verbal and written consent to forensically extract the contents of her cellular telephone. A preliminary search of the phone revealed numerous messages between PEREIRA and VICTIM 1 where PEREIRA was telling VICTIM 1 she needed to "work," which your Affiant, through training and experience, understands as to engage in sex dates. Cash App transactions were also mentioned during their conversations and explicit photographs were located that were sent from VICTIM 1 to PEREIRA for the purposes of online commercial sex advertisements.

24. Following the interview of VICTIM 1, PEREIRA was interviewed. PEREIRA advised that she had been asked to drive VICTIM 1 to the Stadium Hotel located in Miami Gardens. PEREIRA knew VICTIM 1 for about five years, but did not know why she needed a ride. Her boyfriend, WALKER, was in the backseat of the car and came along for the ride. She was driving WALKER's mother's car. PEREIRA said she was a "fighter."

25. PEREIRA was read her *Miranda* rights, stated she clearly understood them, and agreed to speak with law enforcement.

26. PEREIRA advised that she met VICTIM 1 through Facebook around 2014 or 2015. PEREIRA advised she used the "Talk-a-tone" app to communicate with people, but she had not used it for herself since last year in 2019. PEREIRA used the app because it allowed her to use a fake telephone number when placing calls. PEREIRA provided consent for law enforcement to search her two cell phones.

27. A preliminary review of PEREIRA's cell phone indicates that PEREIRA was using the "Talk-a-tone" app to coordinate VICTIM 1's date with the UC. Further, a preliminary review of the phone reveals the following conversation on January 27, 2020 between PEREIRA and WALKER:

> PEREIRA: Tried calling you bae . . . taking her to her outcall now.
> WALKER: OK, I need 40
> PEREIRA: You crazy you pose to drove to get that
> PEREIRA: How you don't answer the phone
> WALKER: Huh wtf don't worry 160 head pulling up[2]

---

[2] Your Affiant is aware that WALKER's phone number, saved under "Duke" in PEREIRA's phone, is 754-xxx-5800. In addition, the UC was scheduled to pay VICTIM 1 $200. Therefore, WALKER's reference to "160" would indicate $200 minus his $40 payment.

28.     PEREIRA stated that VICTIM 1 was supposed to pay PEREIRA $20 for gas, and that is why PEREIRA agreed to drive VICTIM 1 to the date. PEREIRA admitted she owned a Taser gun and mace, which are located in her home, and that she got a gun permit in December 2019.

29.     Lastly, WALKER was interviewed by law enforcement. WALKER was read his *Miranda* rights and agreed to speak to law enforcement. He was advised by your Affiant that any false statements could subject him to a later charge for obstruction of justice. WALKER stated he was in a relationship with PEREIRA. WALKER denied knowing VICTIM 1 and explained he had never seen her before this night, which your Affiant understands to be a materially false statement about the investigation. WALKER denied any knowledge about prostitution. WALKER advised that he liked guns and shot them at the range, but he did not currently have a gun permit.

## CONCLUSION

30.     Based on the forgoing, I respectfully submit that there is probable cause to believe that TIPHANI PEREIRA and RICHARD TRAVON WALKER did knowingly, in or affecting interstate commerce, recruit, entice, harbor, transport, advertise, maintain, and solicit by any means a person, that is, VICTIM 1, to engage in commercial sex acts by means of force, threats of force, or coercion in violation of Title 18, United States Code, Section 1591(a)(1) and (b)(1), and conspiracy to commit same, in violation of Title 18, United States Code, Section 1594(c). Further, as to WALKER there is probable cause that he did make a false statement to a federal law

enforcement officer, in violation of Title 18, United States Code, Section 1001.

**FURTHER YOUR AFFIANT SAYETH NAUGHT.**

Joseph R. Oliver, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
this **28** day of January, 2020.

**LISETTE M. REID**
**UNITED STATES MAGISTRATE JUDGE**
**SOUTHERN DISTRICT OF FLORIDA**